Justice ALITO, dissenting.
The Court reads an ambiguous federal statute in a way that brushes aside the constitutional authority of the States and produces truly strange results.
Under the Constitution, the States, not Congress, have the authority to establish the qualifications of voters in elections for Members of Congress. See Art. I, § 2, cl. 1 (House); Amdt. 17 (Senate). The States also have the default authority to regulate federal voter registration. See Art. I, § 4, cl. 1. Exercising its right to set federal voter qualifications, Arizona, like every other State, permits only U.S. citizens to vote in federal elections, and Arizona has concluded that *39 this requirement cannot be effectively enforced unless applicants for registration are required to provide proof of citizenship. According to the Court, however, the National Voter Registration Act of 1993 (NVRA) deprives Arizona of this authority. I do not think that this is what Congress intended.
I also doubt that Congress meant for the success of an application for voter registration to depend on which of two valid but substantially different registration forms *2271 the applicant happens to fill out and submit, but that is how the Court reads the NVRA. The Court interprets one provision, 42 U.S.C. § 1973gg-6(a)(1)(B), to mean that, if an applicant fills out the federal form, a State must register the applicant without requiring proof of citizenship. But the Court does not question Arizona's authority under another provision of the NVRA, § 1973gg-4(a)(2), to create its own application form that demands proof of citizenship; nor does the Court dispute Arizona's right to refuse to register an applicant who submits that form without the requisite proof. I find it very hard to believe that this is what Congress had in mind.
These results are not required by the NVRA. Proper respect for the constitutional authority of the States demands a clear indication of a congressional intent to pre-empt state laws enforcing voter qualifications. And while the relevant provisions of the Act are hardly models of clarity, their best reading is that the States need not treat the federal form as a complete voter registration application.
I
A
In light of the States' authority under the Elections Clause of the Constitution, Art. I, § 4, cl. 1, I would begin by applying a presumption against pre-emption of the Arizona law requiring voter registration applicants to submit proof of citizenship. Under the Elections Clause, the States have the authority to specify the times, places, and manner of federal *40 elections except to the extent that Congress chooses to provide otherwise. And in recognition of this allocation of authority, it is appropriate to presume that the States retain this authority unless Congress has clearly manifested a contrary intent. The Court states that "[w]e have never mentioned [the presumption against pre-emption] in our Elections Clause cases," ante, at 2256, but in United States v. Gradwell, 243 U.S. 476, 37 S.Ct. 407, 61 L.Ed. 857 (1917), we read a federal statute narrowly out of deference to the States' traditional authority in this area. In doing so, we explained that "the policy of Congress for [a] great ... part of our constitutional life has been ... to leave the conduct of the election of its members to state laws, administered by state officers, and that whenever it has assumed to regulate such elections it has done so by positive and clear statutes ." Id., at 485, 37 S.Ct. 407 (emphasis added).[1] The presumption against pre-emption applies with full force when Congress legislates in a "field which the States have traditionally occupied," Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), and the NVRA was the first significant federal regulation of voter registration enacted under the Elections Clause since Reconstruction.
The Court has it exactly backwards when it declines to apply the presumption against pre-emption because "the federalism concerns underlying the presumption in the Supremacy Clause context are somewhat weaker" in an Elections Clause case like this one. Ante, at 2257. To the contrary, Arizona has a " 'compelling interest in preserving the integrity of its election *2272 process' " that the Constitution recognizes and *41 that the Court's reading of the Act seriously undermines. Purcell v. Gonzalez, 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam ) (quoting Eu v. San Francisco County Democratic Central Comm., 489 U.S. 214, 231, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) ).
By reserving to the States default responsibility for administering federal elections, the Elections Clause protects several critical values that the Court disregards. First, as Madison explained in defense of the Elections Clause at the Virginia Convention, "[i]t was found necessary to leave the regulation of [federal elections], in the first place, to the state governments, as being best acquainted with the situation of the people." 3 Records of the Federal Convention of 1787, p. 312 (M. Farrand ed. 1911). Because the States are closer to the people, the Framers thought that state regulation of federal elections would "in ordinary cases ... be both more convenient and more satisfactory." The Federalist No. 59, p. 360 (C. Rossiter ed. 1961) (A. Hamilton).
Second, as we have previously observed, the integrity of federal elections is a subject over which the States and the Federal Government "are mutually concerned." Ex parte Siebold, 100 U.S. 371, 391, 25 L.Ed. 717 (1880). By giving States a role in the administration of federal elections, the Elections Clause reflects the States' interest in the selection of the individuals on whom they must rely to represent their interests in the National Legislature. See U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 858-859, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (THOMAS, J., dissenting).
Third, the Elections Clause's default rule helps to protect the States' authority to regulate state and local elections. As a practical matter, it would be very burdensome for a State to maintain separate federal and state registration processes with separate federal and state voter rolls. For that reason, any federal regulation in this area is likely to displace not only state control of federal elections but also state control of state and local elections.
Needless to say, when Congress believes that some overriding national interest justifies federal regulation, it has the *42 power to "make or alter" state laws specifying the "Times, Places and Manner" of federal elections. Art. I, § 4, cl. 1. But we should expect Congress to speak clearly when it decides to displace a default rule enshrined in the text of the Constitution that serves such important purposes.
The Court answers that when Congress exercises its power under the Elections Clause "it necessarily displaces some element of a pre-existing legal regime erected by the States." Ante, at 2257. But the same is true whenever Congress legislates in an area of concurrent state and federal power. A federal law regulating the operation of grain warehouses, for example, necessarily alters the "pre-existing legal regime erected by the States," see Rice, supra, at 229-230, 67 S.Ct. 1146 -even if only by regulating an activity the States had chosen not to constrain.[2] In light of *2273 Arizona's constitutionally codified interest in the integrity of its federal elections, "it is incumbent upon the federal courts to be certain" that Congress intended to pre-empt Arizona's law. Atascadero State Hospital v. Scanlon, 473 U.S. 234, 243, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985).
B
The canon of constitutional avoidance also counsels against the Court's reading of the Act. As the Court acknowledges, the Constitution reserves for the States the power to decide who is qualified to vote in federal elections. Ante, at 2257 - 2259; see Oregon v. Mitchell, 400 U.S. 112, 210-211, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (Harlan, *43 J., concurring in part and dissenting in part). The Court also recognizes that, although Congress generally has the authority to regulate the "Times, Places and Manner of holding" such elections, Art. I, § 4, cl. 1, a federal law that frustrates a State's ability to enforce its voter qualifications would be constitutionally suspect. Ante, at 2258 - 2259; see ante, at 2263 - 2265 (THOMAS, J., dissenting). The Court nevertheless reads the NVRA to restrict Arizona's ability to enforce its law providing that only United States citizens may vote. See Ariz. Const., Art. VII, § 2. We are normally more reluctant to interpret federal statutes as upsetting "the usual constitutional balance of federal and state powers." Gregory v. Ashcroft, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) ; see Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L.Rev. 527, 540 (1947) ("[W]hen the Federal Government ... radically readjusts the balance of state and national authority, those charged with the duty of legislating are reasonably explicit").
In refusing to give any weight to Arizona's interest in enforcing its voter qualifications, the Court suggests that the State could return to the Election Assistance Commission and renew its request for a change to the federal form. Ante, at 2259 - 2260. But that prospect does little to assuage constitutional concerns. The EAC currently has no members, and there is no reason to believe that it will be restored to life in the near future. If that situation persists, Arizona's ability to obtain a judicial resolution of its constitutional claim is problematic. The most that the Court is prepared to say is that the State "might" succeed by seeking a writ of mandamus, and failing that, "might" be able to mount a constitutional challenge. Ante, at 2260, n. 10. The Court sends the State to traverse a veritable procedural obstacle course in the hope of obtaining a judicial decision on the constitutionality of the relevant provisions of the NVRA. A sensible interpretation of the Act would obviate these difficulties.
II
*44 The NVRA does not come close to manifesting the clear intent to pre-empt that we should expect to find when Congress has exercised its Elections Clause power in a way that is constitutionally questionable. Indeed, even if neither the presumption against pre-emption nor the canon of constitutional avoidance applied, the better reading of the Act would be that Arizona is free to require those who use the federal form to supplement their applications with proof of citizenship.
I agree with the Court that the phrase "accept and use," when read in isolation, is ambiguous, ante, at 2254 - 2255, but I disagree with the Court's conclusion that § 1973gg-4(a)(1)'s use of that phrase *2274 means that a State must treat the federal form as a complete application and must either grant or deny registration without requiring that the applicant supply additional information. Instead, I would hold that a State "accept[s] and use [s]" the federal form so long as it uses the form as a meaningful part of the registration process.
The Court begins its analysis of § 1973gg-4(a)(1)'s context by examining unrelated uses of the word "accept" elsewhere in the United States Code. Ante, at 2254 - 2255. But a better place to start is to ask what it normally means to "accept and use" an application form. When the phrase is used in that context, it is clear that an organization can "accept and use" a form that it does not treat as a complete application. For example, many colleges and universities accept and use the Common Application for Undergraduate College Admission but also require that applicants submit various additional forms or documents. See Common Application, 2012-2013 College Deadlines, Fees, and Requirements, https://www.commonapp.org/CommonApp/Member Requirements.aspx (all Internet materials as visited June 10, 2013, and available in Clerk of Court's case file). Similarly, the Social Security Administration undoubtedly "accepts and uses" its Social Security card application form even though someone applying for a card *45 must also prove that he or she is a citizen or has a qualifying immigration status. See Application for a Social Security Card, Form SS-5 (2011), http://www.socialsecurity. gov/online/ss-5.pdf. As such examples illustrate, when an organization says that it "accepts and uses" an application form, it does not necessarily mean that the form constitutes a complete application.
That is not to say that the phrase "accept and use" is meaningless when issued as a "government diktat " in § 1973gg-4(a)(1). Ante, at 2254 - 2255. Arizona could not be said to "accept and use" the federal form if it required applicants who submit that form to provide all the same information a second time on a separate state form. But Arizona does nothing of the kind. To the contrary, the entire basis for respondents' suit is that Proposition 200 mandates that applicants provide information that does not appear on a completed federal form. Although § 1973gg-4(a)(1) forbids States from requiring applicants who use the federal form to submit a duplicative state form, nothing in that provision's text prevents Arizona from insisting that federal form applicants supplement their applications with additional information.
That understanding of § 1973gg-4(a)(1) is confirmed by § 1973gg-4(a)(2), which allows States to design and use their own voter registration forms "[i]n addition to accepting and using" the federal form. The Act clearly permits States to require proof of citizenship on their own forms, see §§ 1973gg-4(a)(2) and 1973gg-7(b) -a step that Arizona has taken and that today's decision does not disturb. Thus, under the Court's approach, whether someone can register to vote in Arizona without providing proof of citizenship will depend on the happenstance of which of two alternative forms the applicant completes. That could not possibly be what Congress intended; it is as if the Internal Revenue Service issued two sets of personal income tax forms with different tax rates.
*46 We could avoid this nonsensical result by holding that the Act lets the States decide for themselves what information "is necessary ... to assess the eligibility of the applicant"-both by designing their own forms and by requiring that federal form applicants provide supplemental information when appropriate.
*2275 § 1973gg-7(b)(1). The Act's provision for state forms shows that the purpose of the federal form is not to supplant the States' authority in this area but to facilitate interstate voter registration drives. Thanks to the federal form, volunteers distributing voter registration materials at a shopping mall in Yuma can give a copy of the same form to every person they meet without attempting to distinguish between residents of Arizona and California. See H.R.Rep. No. 103-9, p. 10 (1993) ("Uniform mail forms will permit voter registration drives through a regional or national mailing, or for more than one State at a central location, such as a city where persons from a number of neighboring States work, shop or attend events"). The federal form was meant to facilitate voter registration drives, not to take away the States' traditional authority to decide what information registrants must supply.[3]
The Court purports to find support for its contrary approach in § 1973gg-6(a)(1)(B), which says that a State must "ensure that any eligible applicant is registered to vote in an election ... if the valid voter registration form of the applicant is postmarked" within a specified period. Ante, at 2255. The Court understands § 1973gg-6(a)(1)(B) to mean that a State must register an eligible applicant if he or she submits a " 'valid voter registration form.' " Ante, at 2255. But when read in context, that provision simply identifies the *47 time within which a State must process registration applications; it says nothing about whether a State may require the submission of supplemental information. The Court's more expansive interpretation of § 1973gg-6(a)(1)(B) sneaks in a qualification that is nowhere to be found in the text. The Court takes pains to say that a State need not register an applicant who properly completes and submits a federal form but is known by the State to be ineligible. See ante, at 2257 - 2258. But the Court takes the position that a State may not demand that an applicant supply any additional information to confirm voting eligibility. Nothing in § 1973gg-6(a)(1)(B) supports this distinction.
What is a State to do if it has reason to doubt an applicant's eligibility but cannot be sure that the applicant is ineligible? Must the State either grant or deny registration without communicating with the applicant? Or does the Court believe that a State may ask for additional information in individual cases but may not impose a categorical requirement for all applicants? If that is the Court's position, on which provision of the NVRA does it rely? The Court's reading of § 1973gg-6(a)(1)(B) is atextual and makes little sense.
* * *
Properly interpreted, the NVRA permits Arizona to require applicants for federal voter registration to provide proof of eligibility. I therefore respectfully dissent.

The majority refers to Article I, § 4, cl. 1, as the "Elections Clause." See, e.g., ante, at 2252 - 2253. Since there are a number of Clauses in the Constitution dealing with elections, I refer to it using the more descriptive term, Times, Places and Manner Clause.

Article I, §§ 2 and 4, and the Seventeenth Amendment concern congressional elections. The NVRA's "accept and use" requirement applies to all federal elections, even presidential elections. See § 1973gg-4(a)(1). This Court has recognized, however, that "the state legislature's power to select the manner for appointing [presidential] electors is plenary; it may, if it chooses, select the electors itself." Bush v. Gore, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (per curiam ) (citing U.S. Const., Art. II, § 1, and McPherson v. Blacker, 146 U.S. 1, 35, 13 S.Ct. 3, 36 L.Ed. 869 (1892) ). As late as 1824, six State Legislatures chose electoral college delegates, and South Carolina continued to follow this model through the 1860 election. 1 Guide to U.S. Elections 821 (6th ed. 2010). Legislatures in Florida in 1868 and Colorado in 1876 chose delegates, id., at 822, and in recent memory, the Florida Legislature in 2000 convened a special session to consider how to allocate its 25 electoral votes if the winner of the popular vote was not determined in time for delegates to participate in the electoral college, see James, Election 2000: Florida Legislature Faces Own Disputes over Electors, Wall Street Journal, Dec. 11, 2000, p. A16, though it ultimately took no action. See Florida's Senate Adjourns Without Naming Electors, Wall Street Journal, Dec. 15, 2000, p. A6. Constitutional avoidance is especially appropriate in this area because the NVRA purports to regulate presidential elections, an area over which the Constitution gives Congress no authority whatsoever.

The Court argues that the federal form would not accomplish this purpose under my interpretation because "a volunteer in Yuma would have to give every prospective voter not only a Federal Form, but also a separate set of either Arizona- or California-specific instructions." Ante, at 2256, n. 4. But this is exactly what Congress envisioned. Eighteen of the federal form's 23 pages are state-specific instructions.