The **UNITED STATES** of America,

v.

**Martin SOLOMON** et al., **Defendants.**

United States District Court
S. D. New York.

April 15, 1963.

---

Robert M. Morgenthau, U. S. Atty., for the United States; Charles J. Fanning, Asst. U. S. Atty., of counsel.

Irving Younger, New York City, for defendant Martin Solomon.

LEVET, District Judge.

Martin Solomon, one of the above-named defendants, is charged in two counts with violations of Title 21 U.S.C. §§ 331(k), 333(a) and 353(b) (1); Title 18 U.S.C. § 2, in dispensing certain drugs, to wit, 35 tablets of Metandren (Methyltestosterone) and 100 tablets of D'Amphetamine Sulfate, without a prescription, etc.

The defendant waived trial by jury and was tried before the court. Stipula-

tions conceded the performance but not the illegality of the acts set forth in the information. At the close of the government's case, the defendant rested and moved to dismiss the information.

The charge was brought on by information (filed October 10, 1962), signed by Vincent L. Broderick, United States Attorney, who, after the resignation of his former superior, Robert M. Morgenthau, was appointed by the judges of the United States District Court, Southern District of New York, by order dated September 5, 1962, as the interim United States Attorney, pursuant to the provisions of Section 506 of Title 28, United States Code. Misdemeanors may be prosecuted by an information signed by the attorney for the government. Rule 7(a), (c), Fed.R.Crim.P.

Title 28 U.S.C. § 506 is as follows:

"The district court for a district in which the office of United States attorney is vacant, may appoint a United States attorney to serve until the vacancy is filled. The order of appointment by the court shall be filed with the clerk of the court. June 25, 1948, c. 646, § 1, 62 Stat. 909."

Title 28 U.S.C. § 501 is as follows:

"The President shall appoint, by and with the advice and consent of the Senate, a United States attorney for each judicial district. As amended Mar. 18, 1959, Pub.L. 86–3, § 11(a), 73 Stat. 9."

Defendant claims that the information is invalid because the appointment of Mr. Broderick by the district court judges, pursuant to Section 506, is unconstitutional as it violates the doctrine of separation of powers.

## I.

At the outset is the question of the timeliness of the defendant's objections to the information. Rule 12(b) (2), Fed. R.Crim.P. provides: "Defenses and objections based on defects in the institution of the prosecution or in the indictment or information other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion before trial. * * *"

Under Rule 12(b) (2) a failure of the information to charge a crime may be raised at any time during the pendency of the proceedings in the trial court (cf. United States v. Vannatta, 189 F.Supp. 937 (D.C.Hawaii 1960), where indictment was challenged on this ground the day before the trial) and even for the first time on appeal (Carlson v. United States, 296 F.2d 909 (9 Cir., 1961)). Similarly, the lack of the court's jurisdiction over the offense charged cannot be waived. See United States v. Rosenberg, 195 F.2d 583 (2 Cir., 1952). However, defects such as the duplicity of the indictment (United States v. Frank, 3 Cir., 290 F.2d 195), its undue length or a prejudicial joinder (United States v. Campisi, 306 F.2d 308 (2 Cir., 1962)) or personal jurisdiction over the defendant (United States v. Rosenberg, supra) are waived by failure to raise a timely objection. The question in this case is simply to determine whether the alleged defective signature of the United States Attorney is such as can be waived by failure to raise a timely objection.

The chronology of the essential facts in this case is simple. On September 5, 1962, this court, pursuant to 28 U.S.C. § 506 appointed Vincent L. Broderick United States Attorney. This information was filed October 10, 1962. Originally, the defendant pleaded guilty to the counts, but thereafter moved to withdraw the plea. On November 20, 1962, his motion was granted and, on the same day, he entered a plea of not guilty. At the same time, Judge Weinfeld set December 3, 1962 for motions. On December 4, 1962, Mr. Broderick was superseded when Robert M. Morgenthau, who had been reappointed by the President, was sworn in as United States Attorney. The prosecution of this offense was continued under Mr. Morgenthau. On December 17, 1962, defendant's motion to suppress certain evidence was denied. On March 15, 1963, the trial was held and concluded.

The alleged defect, notwithstanding its alleged constitutional basis, appears to be one in the institution of the prosecution, rather than a jurisdictional defect or a failure to charge an offense. While there is no case precisely in point, analogously the periphery of the problem has not gone untouched.

Thus, it has consistently been held under Rule 12(b) that any defects in the empaneling of the grand jury are waived by the defendant's failure to raise a timely objection. See Scales v. United States, 260 F.2d 21, 44–46 (4 Cir., 1958), aff'd 367 U.S. 203, 259, 81 S.Ct. 1469, 6 L.Ed.2d 782. In Poliafico v. United States, 237 F.2d 97 (6 Cir., 1956), cert. denied 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597 (1957) the defendant was held to have waived the defect where he first objected to the empaneling of the grand jury at the time the petit jury was being selected. See also Moffatt v. United States, 232 F. 522, 529 (8 Cir., 1916), cited with approval in Notes of Advisory Committee on the Criminal Rules, 18 U.S.C.A.

In United States v. Atlantic Commission Co., 45 F.Supp. 187 (E.D.N.C.1942), the defendant challenged the indictment on the ground it was not signed, authorized or endorsed by the United States Attorney for the district, but, rather, was signed by a Special Assistant Attorney General appointed under a statute which the defendants challenged as unconstitutional in violation of the Fifth Amendment. The court held under the circumstances "that the omission of the United States Attorney's signature is merely a formality, which does not invalidate the indictment." United States v. Atlantic Commission Co., supra at 192. See also, United States v. Sheffield Farms Co., 43 F.Supp. 1, 3 (S.D.N.Y.1942) (indictment signed by Special Assistant Attorney General); Frisbie v. United States, 157 U.S. 160, 15 S.Ct. 586, 39 L.Ed. 657 (1895).

■ However, analogies are not identities and the defendant is correct that the subscription of an indictment by the United States Attorney is simply a cer-

tification that he will perform his statutory duty of prosecuting those indicted. While these cases are not entirely dispositive of the issue, each analogously supports the proposition that a defect such as presented here is one in the institution of the prosecution and may be waived by the lack of a timely objection.

The defendant's position, "if there is no indictment or information, the prosecution must fail, for without an indictment or information no offense has been charged nor does the court have jurisdiction of the case," is somewhat conclusory. What the defendant alleges is not that there is no information, but, rather, that the information is defective because of the invalid subscription by the United States Attorney. Albeit the constitutional basis of the defendant's objection, this defect is not a failure of the information to charge a crime nor a lack of jurisdiction in the court of the offense charged.

Under Rule 12(b) (2) the court "for cause shown may grant relief from the waiver." But the defendant has shown nothing to occasion the granting of such relief. "A defendant seeking an adjudication of tardily made motions has the burden of demonstrating that these motions are nonetheless made within a reasonable time because of the presence of special circumstances." United States v. Freeling, 31 F.R.D. 540, 543–544 (S.D. N.Y.1962). The information concerned with this defense appears to have been available to the defendant since the commencement of the action (cf. Scales v. United States, supra) and there is no contention that this defense could be more appropriately entered at the trial where a fuller opportunity for its presentation would be available. Cf. United States v. Shelton, 211 F.Supp. 869 (D.D. C.1962).

It is difficult to conceive a defect which could more correctly be characterized as one in the institution of the prosecution than that presented urged by the defendant. Since the record makes clear that the defense was waived, Fed.R.Crim.P. 12(b), there would appear to be no need

to pass on the constitutional issues presented. Yet, in view of the fact that the "brooding omnipotence" of the Constitution may well alter the normally salutory rule of waiver, I shall pass to the merits.

## II.

### THE DOCTRINE OF SEPARATION OF POWERS.

The general nature of the doctrine of separation of governmental powers has been stated by the United States Supreme Court: Kilbourn v. Thompson, 103 U.S. 168, 190, 26 L.Ed. 377 (1880); Springer v. Philippine Islands, 277 U.S. 189, 201, 48 S.Ct. 480, 72 L.Ed. 845 (1928). In Kilbourn, Mr. Justice Miller said supra, 103 U.S. at 190–191:

"It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers intrusted to government, whether State or national, are divided into the three grand departments, the executive, the legislative, and the judicial. That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other. To these general propositions there are in the Constitution of the United States some important exceptions. * * *"

In Springer, Mr. Justice Sutherland wrote:

"It may be stated then, as a general rule inherent in the American constitutional system, that, unless otherwise expressly provided or incidental to the powers conferred, the legislature cannot exercise either executive or judicial power; the executive cannot exercise either legislative or judicial power; the judiciary cannot exercise either executive or legislative power. * * *" (277 U.S. pp. 201–202, 48 S.Ct. p. 482.)

See also J. W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 406, 48 S.Ct. 348, 72 L.Ed. 624 (1928).

The origin of this doctrine stems from Montesquieu, Harrington, and Locke (Willis, Constitutional Law, 130 (1936)) and from Cromwell's Institute of Government (Willis, supra, at 135) and to some extent from Plato and Aristotle (Vanderbuilt, The Doctrine of the Separation of Powers and Its Present Day Significance, 38, 39 (1953)). It was endorsed by our Founding Fathers, Washington, John Adams, Jefferson and Madison (Vanderbilt, supra at 4. See also 10 Holdsworth, History of English Law, 713–716 (1938); Sharp, The Classical American Doctrine of "The Separation of Powers," 2 U.Chi. L.Rev. 385–436 (1935)).

## III.

### THE DOCTRINE DOES NOT REQUIRE THREE WATER-TIGHT COMPARTMENTS.

"The written Constitution of the United States does not expressly create a separation of governmental powers. All the powers of government may be commingled by any state of the Union without a violation of the United States Constitution." Willis, Constitutional Law, 133 (1936); Dreyer v. Illinois, 187 U.S. 71, 23 S.Ct. 28, 47 L.Ed. 79 (1902).

██ Although the powers of government under the United States Constitution are divided into the legislative, the executive and judicial, there is no complete separation of powers "by conferring the whole of any class of functions exclusively upon the department primarily empowered to exercise them and by limiting those exercisable by it to those belonging to that class." Rottschaefer,

Constitutional Law, 45 (1939). See also Willis, supra at 130–177.

Madison, writing in The Federalist No. 47, "The Separation of Powers: I," wrote:

"One of the principal objections inculcated by the more respectable adversaries to the Constitution, is its supposed violation of the political maxim, that the legislative, executive, and judiciary departments ought to be separate and distinct. In the structure of the federal government, no regard, it is said, seems to have been paid to this essential precaution in favor of liberty. The several departments of power are distributed and blended in such a manner as at once to destroy all symmetry and beauty of form, and to expose some of the essential parts of the edifice to the danger of being crushed by the disproportionate weight of other parts." (The Federalist, Wright ed. 1961, at 336)

After referring to Montesquieu as the "oracle" cited on this subject and stating that Montesquieu viewed the Constitution of England as the Standard or as "the mirror of political liberty," Madison further elaborated:

"On the slightest view of the British Constitution, we must perceive that the legislative, executive, and judiciary departments are by no means totally separate and distinct from each other. The executive magistrate forms an integral part of the legislative authority. He alone has the prerogative of making treaties with foreign sovereigns, which, when made, have, under certain limitations, the force of legislative acts. All the members of the judiciary department are appointed by him, can be removed by him on the address of the two Houses of Parliament, and form, when he pleases to consult them, one of his constitutional councils. One branch of the legislative department forms also a great constitutional council to the executive chief, as, on another hand, it is the sole depositary of judicial power in cases of impeachment, and is invested with the supreme appellate jurisdiction in all other cases. The judges, again, are so far connected with the legislative department as often to attend and participate in its deliberations, though not admitted to a legislative vote.

"From these facts, by which Montesquieu was guided, it may clearly be inferred that, in saying 'There can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates,' or, 'if the power of judging be not separated from the legislative and executive powers,' he did not mean that these departments ought to have no *partial agency* in, or no *control* over, the acts of each other. His meaning, as his own words import, and still more conclusively as illustrated by the example in his eye, can amount to no more than this, that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution are subverted. This would have been the case in the constitution examined by him, if the king, who is the sole executive magistrate, had possessed also the complete legislative power, or the supreme administration of justice; or if the entire legislative body had possessed the supreme judiciary, or the supreme executive authority. This, however, is not among the vices of that constitution. The magistrate in whom the whole executive power resides cannot of himself make a law, though he can put a negative on every law; nor administer justice in person, though he has the appointment of those who do administer it. The judges can exercise no executive prerogative, though they are shoots from the executive stock; nor any legislative

function, though they may be advised with by the legislative councils. The entire legislature can perform no judiciary act, though by the joint act of two of its branches the judges may be removed from their offices, and though one of its branches is possessed of the judicial power in the last resort. * * *" (pp. 337–38) [1]

Hence, Madison, referring to the doctrine of separation of powers, wrote: "* * * the political apothegm there examined does not require that the legislative, executive, and judiciary departments should be wholly unconnected with each other." The Federalist No. 48, at 343 (Wright ed. 1961).[2]

Madison, as Professor Malcolm P. Sharp pointedly observed, "urged that the classical statements and examples of the principle indicated that the doctrine was not to be rigidly, but flexibly, applied" and "recognized clearly that a government could operate efficiently only if it were made flexible by blending." 2 U.Chi.L.Rev. 385, 407.

■ Chief Justice Vanderbilt of the Supreme Court of New Jersey, in 1953 wrote: *"The division of government into three branches does not imply,* as its

critics would have us think, *three watertight compartments.* Montesquieu, as we have seen, knew better; the three departments, he said, must move 'in concert.'" (Emphasis supplied) Vanderbilt, op. cit. supra at 50. The isolation of these powers is not intended and any completed division between departments is impossible.[3] Note, Constitutional Law, Separation of Powers, 38 Yale L.J. 114 (1928); 16 C.J.S. Constitutional Law § 105, p. 486 and cases cited.

Chief Justice Vanderbilt also pointed out the many non-judicial functions performed by judges from colonial times to and including the present. Vanderbilt, The Doctrine of the Separation of Powers and Its Present Day Significance, 113–120 (1953).

## IV.

## APPOINTMENT OF A TEMPORARY PROSECUTING OFFICER DOES NOT VIOLATE THE CONSTITUTION OF THE UNITED STATES.

As already appears, although the doctrine of separation of powers is a most salutary doctrine, it was never rigidly engrafted upon the Constitution. Its application, therefore, must be subordinated to the particular provisions of that

---

1. Holdsworth well states:
   "* * * The main faults of Montesquieu's theory were that it exaggerated the sharpness of the separation; and that it failed to bring out the fact that it was the autonomy in the action and in the development of these divided, though not quite separated powers, which, by enabling them to check and balance one another, was the guarantee of liberty. * * *" 10 Holdsworth, History of English Law 721 (1938).

2. Madison in The Federalist No. 47 stated: "If we look into the constitutions of the several States, we find that, notwithstanding the emphatical and, in some instances, the unqualified terms in which this axiom has been laid down, there is not a single instance in which the several departments of power have been kept absolutely separate and distinct." (op. cit. supra at 339) It appears that at the time of the proposed adoption of the Federal Constitution there were at least seven states, to wit, New Hampshire,

Massachusetts, Maryland, Virginia, North Carolina and Georgia, which had constitutional provisions requiring separation of powers. (op. cit. supra at 339–342) *Yet no such provision was inserted in the United States Constitution.*

3. In "redefining" the doctrine of separation of powers, Willis wrote:
   "* * * this doctrine can be stated as the doctrine that there are three branches of government and that each department of government has given to it and may exercise constitutionally any power, whatever its essential nature, if such power has been given to it by the people either directly by the Constitution or indirectly by the Supreme Court; that each may not exercise any powers not so given to it, irrespective of what their essential nature may be; but that at present *each department exercises more of its own essential powers than any other department exercises.*" (pp. 176–77) (Emphasis supplied)

instrument in this instance as to methods of appointment.

Accordingly, the Constitution provides that "the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." Constitution, Art. 2, § 2, Cl. 2.

Thus, Congress had implemented Article 2, Section 2, Clause 2 by the passage of Section 506, Title 28 U.S.C., above quoted. In similar fashion, Congress has empowered the district courts to appoint bankruptcy referees (Title 11 U.S.C. § 62); to appoint United States commissioners (Title 28 U.S.C. § 631); clerks of the district courts (Title 28 U.S.C. § 751).

The delegation of appointment of bankruptcy referees has been held constitutional under Article 2, Section 2 of the United States Constitution in Birch v. Steele, 5 Cir., 1908, 165 F. 577, 586; as to United States commissioners, see Rice v. Ames, 180 U.S. 371, 378, 21 S.Ct. 406, 45 L.Ed. 577 (1901); Go-Bart Importing Co. v. United States, 282 U.S. 344, 353, 51 S.Ct. 153, 75 L.Ed. 374 (1931); In re Circuit Ct. Com'rs, 65 F. 314 (C.C.W.D.N.C.1894); and as to clerks, In re Hennen, 13 Pet. 230, 10 L.Ed. 138 (1839).

As indicated by Willis, "Appointment and removal of officers should probably strictly be regarded as executive functions; yet under state and the United States constitutions they seem to be those which may be exercised by any branch of the government." In fact, "Prior to the adoption of the United States Constitution, the appointing function was not regarded as necessarily included in the executive office; * * *." Willis, Constitutional Law 141 (1936). See also 16 C.J.S. Constitutional Law § 139, p. 640.

In connection with appointments, Willis stated:

"Encroachment of Judicial on Executive Department: Appointment. —By the weight of authority the legislature may vest in the courts, or judges, the appointment of officers whose selection is not otherwise provided for in the constitution. *The theory of these decisions seems to be that the power of appointment is not intrinsically an executive power. A better explanation would be that in this respect the doctrine of separation of powers has been broken down.* There are some contra decisions." (Emphasis supplied) (Willis, op. cit. supra at 150–51)

The essential principles involved in this case were passed upon by the United States Supreme Court as long ago as 1879 in Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717 (1879). In that case a federal statute entitled, "An Act to enforce the right of citizens of the United States to vote in the several States of this Union, and for other purposes" was involved. The statute related to elections of members of the House of Representatives. One of the objections to the enforcement of the statute was that the Act of Congress imposed upon the circuit courts duties not judicial in requiring them to appoint supervisors of elections whose duties, it was alleged, were entirely executive in character. It was contended that no power can be conferred upon the courts of the United States to appoint officers whose duties are not connected with the judicial department of the government. As to this feature, Mr. Justice Bradley stated:

"The Constitution declares that 'the Congress may, by law, vest the appointment of such inferior officers as they think proper, in the President alone, in the courts of law, or in the heads of departments.' It is no doubt usual and proper to vest the appointment of inferior officers in that department of the government, executive or judicial, or in that particular executive department to which the duties of such officers appertain. But there is no absolute requirement to this effect in the Constitution; and, if there

were, it would be difficult in many cases to determine to which department an office properly belonged. Take that of marshal, for instance. He is an executive officer, whose appointment, in ordinary cases, is left to the President and Senate. But if Congress should, as it might, vest the appointment elsewhere, it would be questionable whether it should be in the President alone, in the Department of Justice, or in the courts. The marshal is pre-eminently the officer of the courts; and, in case of a vacancy, Congress has in fact passed a law bestowing the temporary appointment of the marshal upon the justice of the circuit in which the district where the vacancy occurs is situated.

"But as the Constitution stands, the selection of the appointing power, as between the functionaries named, is a matter resting in the discretion of Congress. And, looking at the subject in a practical light, it is perhaps better that it should rest there, than that the country should be harassed by the endless controversies to which a more specific direction on this subject might have given rise. The observation in the case of Hennen, to which reference is made (13 Pet. 258 [10 L.Ed. 138]), that the appointing power in the clause referred to 'was no doubt intended to be exercised by the department of the government to which the official to be appointed most appropriately belonged,' was not intended to define the constitutional power of Congress in this regard, but rather to express the law or rule by which it should be governed. The cases in which the courts have declined to exercise certain duties imposed by Congress, stand upon a different consideration from that which applies in the present case. * * *

"In our judgment, Congress had the power to vest the appointment of the supervisors in question in the circuit courts." (supra, 100 U.S. at 397–398)

In United States v. Mitchell, 136 F. 896 (C.C.D.Or.1905), the defendant attacked an indictment because the United States Attorney, who secured this indictment, was not a resident of the district, although appointed by the court. The court, however, stated, 136 F. at 906:

"* * * The principle is settled that there is a presumption from the undisturbed exercise of a public office that the appointment to it is valid. *In the present case it is not questioned that the court had authority to make a valid appointment to this office*, and that it did appoint Mr. Heney, and that during the performance by him, as district attorney, of all the acts and things complained of, he was in the undisturbed and unquestioned exercise of that office. His right to the office cannot be attacked collaterally. Whether he is in fact ineligible to hold the office is not material to the purposes of this inquiry. He is a de facto officer, and is entitled to continue in the office until it is judicially declared by a competent tribunal, in a proceeding for that purpose, that he has no right to it. 8 Ency. of Law, 788, citing a large number of cases. * * *" (Emphasis supplied)

Furthermore, the appointive power of the judiciary contemplated by Section 506 in no wise equates to the normal appointive power. First, the judiciary's power is only of a temporary nature. "[T]he appointment itself contemplates only a temporary mode of having the duties of the office performed until the President acts * * *." 16 Ops. Att'y Gen. 538, 540 (1880). Second, the exercise of the appointive power by the judiciary in no wise binds the executive. The statute clearly contemplates that the executive branch is free to choose another United States Attorney at any time, the judicial appointment notwith-

standing. "It was not to enable the circuit justice to oust the power of the president to appoint, but to authorize him to fill the vacancy until the president should act, and no longer." In re Farrow, 3 F. 112 (C.C.N.D.Ga.1880). "The authority given to fill the office to the circuit justice is an authority only to fill it until action is taken by the President." 16 Ops. Att'y Gen., supra at 540.

■ The order of this court appointing Mr. Broderick, which is in effect challenged here, provides: "WE DO HEREBY APPOINT Vincent L. Broderick to serve as such Attorney of the United States * * * until the President of the United States shall fill such vacancy * * *." Both the statute and the exercise of its power here are constitutionally permissible.

## V.

Lastly, the defendant contends that should Section 506 be found to be valid under Article 2, Section 2, Clause 2, United States Constitution, it would then provide a nexus between court and prosecutor too close to comport with due process of law.

The defendant makes no contention that there was such a nexus in this case. Rather, he contends that the court, possessing the appointive power, likewise possesses removal power and it is the combination that provides an alleged nexus too close to comport with due process. Even assuming that such a nexus would prove violative of due process (cf. Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927)), the contention rests on an unfounded premise. While the normal appointive power carries with it the power of removal (In re Hennen, 13 Pet. 230, 10 L.Ed. 138 (1839)), the power in this instance is in no wise equivalent. As has already been pointed out, the President may, at any time, remove the judicially appointed United States Attorney, pursuant to 28 U.S.C. § 504. The language of subsection (b), "[e]ach United States attorney shall be subject to removal by the President * * *," clearly authorizes the executive to remove any United States Attorney, regardless of the nature of his appointment. The statutory scheme for the temporary appointment by the judiciary of the United States Attorney comports in all respects with due process of law.

## CONCLUSION

Since I have found both that the defendant has waived the defense by failing to raise a timely objection and, in the alternative, that the statute is constitutional, I must and do find the defendant Solomon guilty.

Sentence is set for May 14, 1963, at 10:00 A.M. in room 705. The customary pre-sentence report is to be prepared.

So ordered.