John F. BANZHAF, III, et al., Plaintiffs,

v.

William French SMITH, et al., Defendants.

Civ. A. No. 83–3161.

United States District Court, District of Columbia.

May 14, 1984.

---

John F. Banzhaf III, pro se.

Peter H. Meyers, Washington, D.C., for plaintiffs.

David J. Anderson, Susan Riley, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

Plaintiffs brought this action under the Ethics in Government Act[1] to require the Attorney General to apply to the special panel of the U.S. Court of Appeals[2] for the appointment of an Independent Counsel[3] pursuant to that Act. Such counsel would be charged with the responsibility for investigating whether high-ranking government officials committed federal offenses in connection with the removal of briefing materials and other documents from the Carter White House to the Reagan headquarters during the 1980 presidential campaign. On February 29, 1984, the Court denied the government's motion to dismiss in which it was contended that the plaintiffs lacked standing to sue and that the complaint failed to state a claim upon which relief might be granted.[4] On March 29, 1984, plaintiffs moved for summary judgment, and on April 19, 1984, the government cross moved for summary judgment.[5]

### I

The Court's ruling on the motion to dismiss rejected the government's legal contentions and left for adjudication only the factual issue whether plaintiffs had presented the Attorney General with information sufficient to require him to conduct a preliminary investigation under the Ethics Act. Slip opinion at 9 n. 22. In light of that background, the papers filed by the government and the arguments it presented at the hearing on April 27, 1984, are as significant for what they do not say as for what they do.

Plaintiffs' Statement of Material Facts, filed pursuant to the Rules[6] asserts

---

1. Ethics in Government Act of 1978, as amended, 28 U.S.C. §§ 591 et seq.

2. 28 U.S.C. § 49 establishes a Special Division of the United States Court of Appeals for the District of Columbia to appoint Independent Counsel upon application of the Attorney General and to define the prosecutorial jurisdiction of such Counsel.

3. Independent Counsel was known under previous law as a Special Prosecutor.

4. *Banzhaf v. Smith*, 588 F.Supp. 1489 (D.D.C. 1984).

5. On April 5, 1984, the government secured an extension of time to file a response to plaintiffs' motion for summary judgment, and then, rather than filing such a response, it submitted its own summary judgment motion. In view of the briefing and hearing schedule established by the Court, this maneuver deprived plaintiffs of the time they normally would have had to file a response to the government's motion. Nevertheless, the Court permitted the government's filing.

6. Under Rule 56, Fed.R.Civ.P., the movant has the burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. Subdivision (c) of the Rule provides that:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

In addition, Rule 1–9(h) of the Rules of this Court provides that each motion for summary judgment filed pursuant to Rule 56 must contain a statement of the material facts as to which the moving party contends there is no genuine issue. A party opposing such a motion is required to file a concise statement of genuine issues setting forth "all materials facts as to which it is contended there exists a genuine issue necessary to be litigated." The Rule also provides that:

In determining a motion for summary judgment, the court may assume that the facts as claimed by the moving party in his statement of material facts are admitted to exist except as and to the extent that such facts are controverted in a statement filed in opposition to the motion.

that the formal request they submitted to the Attorney General contained numerous allegations of criminal wrongdoing by officials covered by the Ethics Act. That Statement goes on to recite specific and credible evidence that certain high-level officers of government may have violated criminal laws in connection with the transfer of certain briefing materials and other confidential documents from the Carter White House to Reagan campaign aides. See the Appendix to this Opinion which reproduces information submitted to the Attorney General as it is recited in plaintiffs' Statement of Material Facts.

As indicated in note 6 *supra*, these assertions are deemed under the Rules to be established for purposes of this litigation unless they are contradicted in the government's own Statement of Material Facts. The government's Statement failed entirely to contradict any of these assertions,[7] and it did not allege any specific facts showing

that there is any genuine factual dispute. Indeed, the government states that it is in agreement with the plaintiffs "that there are no material facts in dispute and that this case is ripe for summary judgment." Memorandum at 2.

In view of that record, it must be taken as established for purposes of the government's remaining arguments that the materials submitted by plaintiffs to the Attorney General are sufficiently specific and credible to trigger a preliminary investigation[8] under the Ethics Act.[9]

Thus, the remainder of the government's case necessarily rests on the proposition that, as a matter of law, the Court is without authority to require the Attorney General to proceed in accordance with the Act even though he has specific and credible evidence that persons covered by the Act may have committed federal criminal offenses. It is to the particular contentions

7. The government's motion and the supporting memorandum of law are likewise devoid of any serious claim that the evidence submitted to the Attorney General is not sufficient to trigger an investigation under the Act. At one point in its memorandum (at 7 n. 3), the government asserts that a non-Ethics Act investigation, such as the one conducted by the Department of Justice, might be appropriate with respect to persons other than covered officials or in those cases where the evidence might not be specific and credible enough to trigger the Ethics Act. In addition, the government states that "plaintiffs' factual allegations do not justify an Ethics Act inquiry" and that the Attorney General believes that "he has not received information sufficient to trigger the Ethics Act process." *Id.* at 2, 5–6. Those oblique and conclusory assertions are not pursued in the remainder of the memorandum and, as indicated, they are not referred to at all in the government's Statement of Material Facts.

8. If the government may be regarded as having, somehow, made a claim that the Attorney General had not been presented with specific and credible information of possibly criminal conduct by covered officials, the Court would set aside that decision under the Administrative Procedure Act as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See 5 U.S.C. § 706(2).

The government has not claimed that the information did not come from credible sources, nor could it have done so, since much of that information came directly from the high rank-

ing officials themselves. Thus, the Attorney General's refusal to investigate could be sustained only, if at all, on the basis that the allegations presented by plaintiff were not sufficiently specific. The legislative history of the Act gives the Court guidance concerning the appropriate standard to apply in that respect. As the Senate Report states, "specific information" means a complaint more detailed than a "generalized allegation of wrongdoing which contains no specific factual support." S.Rep. No. 170 at 52, 1978 U.S.Code Cong. & Ad.News at 4268. Such information was plainly supplied here, and the Court therefore concludes that the Attorney General's failure to find that specific and credible information within the meaning of the Ethics Act had been presented to him was arbitrary and unlawful.

9. As the Court noted on February 29, 1984 (slip opinion at 10 n. 23), the Justice Department's own investigation into the allegations of wrongdoing in connection with the transfer of the so-called "debate papers," did not comply with the requirements of the Ethics Act. In an Ethics Act investigation, the Attorney General may investigate the allegations of criminal wrongdoing only to determine whether they warrant further investigation or prosecution, and he must then report to the special division concerning the appointment of an Independent Counsel. No such report was made, and any purportedly definitive conclusions which the Department may have drawn on the basis of its own, non-Ethics Act investigation, lack validity under the law.

underlying that claim to which the Court now turns.

## II

The government requests initially that the Court reconsider its ruling that plaintiffs have standing to bring this action.[10] However, nothing has been offered in support of that request that the Court did not consider fully in its previous ruling. If anything, since the government has now failed on the record to controvert the existence of evidence sufficient to cause the initiation of an Ethics Act investigation, its arguments are even less persuasive now than they were before that factual question had been resolved.

■ The government argues that, even if the Attorney General has sufficient information, he may decide not to conduct an Ethics Act investigation or to apply for the appointment of Independent Counsel, and no one may question his decision. What that argument necessarily assumes is that, in enacting this statute, Congress intended to give the Attorney General plenary, unreviewable authority to proceed or not to proceed with the machinery established by the Ethics Act as he sees fit. The legislative history of the Act indicates that the opposite is true.

The Ethics Act was a direct outgrowth of the Watergate scandals.[11] Central to those scandals were (1) the failure of the then Attorney General to prosecute those responsible for the "cover-up" of the initial burglary and (2) Executive Branch interference with the special prosecutors who were ultimately appointed to take over the investigation.[12] What we have here is, what is, in several respects, a parallel to that episode, as follows.

During Watergate, burglars broke into a national campaign headquarters in the course of the 1972 campaign to steal docu-

---

**10.** Because the legal consequences of the two arguments are substantially similar for purposes of this case, the Court considers under this heading both the government's standing claim and its claim that the Court lacks power under the statute to order the Attorney General to apply for the appointment of Independent Counsel.

With respect particularly to the Court's authority to review the Attorney General's decision, the government relies additionally on section 592(b)(1) of the Act which provides that, if the Attorney General finds that there are no reasonable grounds to believe that further investigation or prosecution is warranted, the special panel "shall have no power to appoint [an] independent counsel." This, it is said, supports the government's contention that Congress intended to preclude all judicial review of the Attorney General's decision in that regard. Actually, the statute suggests precisely the opposite. Section 592(b)(1) refers only to the judicial panel, not to courts generally. By contrast, Congress provided in subsection (f) of the same section that the Attorney General's decision *to apply* to the special panel for the appointment of Independent Counsel "shall not be reviewable *in any court.*" If Congress had intended to preclude review by "any court" of both the Attorney General's decision to apply for, and his decision *not* to apply for, such appointment, it could have easily done so.

Moreover, notwithstanding discretionary language in the Act (*e.g.,* section 592(a)(1)), the Attorney General's decisions under the Ethics Act do not lie entirely within his discretion. Congress has supplied the necessary "law to apply" by specifying those circumstances under which the Attorney General "shall" conduct a preliminary investigation and those circumstances under which he "shall" apply for the appointment of an independent counsel. See *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). Here, there is no genuine dispute that the Attorney General was supplied with the requisite information and that he nevertheless failed to proceed under the Act. Given these facts, the Attorney General may be required under familiar administrative law principles to perform the essentially ministerial task of applying to the special panel for the appointment of an Independent Counsel. See also, pp. 18–20 *infra.*

**11.** The genesis of the Independent Counsel provisions of the Ethics Act was in the Watergate hearings. *Presidential Campaign Activities of 1972: Hearings on Watergate and Related Activities Before the Senate Select Committee on Presidential Campaign Activities,* 93rd Cong., 1st Sess. (1973).

**12.** Archibald Cox, the first special prosecutor, was dismissed at the direct command of the President. The requests for White House tapes of Leon Jaworski, the second special prosecutor, were met with resistance, and these requests and the court proceedings which followed ultimately led to the resignation of President Nixon.

ments as part of an intelligence operation organized by individuals highly placed in the opposing political party. Although this particular effort was aborted by the arrests of the burglars, other such enterprises were more successful in providing documents and information to top campaign aides. Several of those implicated in the Watergate affair (*e.g.*, White House Counsel John Dean and White House aides H.R. Haldeman and John Ehrlichman) made contradictory statements during the ensuing investigation. And an in-house investigation was conducted by John Dean which yielded no positive results.

According to the unrebutted evidence submitted by plaintiffs in this case, campaign documents may have been stolen during the 1980 campaign and transferred to the headquarters of the opposing political party as part of a large-scale intelligence operation. Senior campaign officials, now high-ranking officers of government, subsequently came into possession of these documents. Some of these officials (*e.g.*, White House Chief of Staff James A. Baker, III and CIA Director William Casey) made directly contradictory statements. Ultimately, a decision was made to conduct only an in-house investigation of the matter without participation by an ᵥindependent prosecutor.

These parallels are not recited to suggest that the Court believes that this case is another Watergate. To the contrary, as stated February 29, 1984,[13] that may not be

true at all, and the parallels do not necessarily suggest that it is.[14] But these parallels are relevant in another way, that is, to a determination of what Congress intended when it enacted the Ethics Act.

If the Court were to accept the Department's arguments on standing and nonreviewability, it would necessarily have to make two fundamental assumptions regarding congressional purpose. First, it would have to assume that, notwithstanding the congressional experience during Watergate with the indifference, or worse, of the then Attorney General to the crimes being committed around him, it intended to vest sole and unquestionable authority [15] in the Attorney General to decide whether and under what circumstances the Independent Counsel mechanism was to be activated. Second, the Court would have to assume that Congress intended to give the Attorney General such unreviewable authority even in a case such as this which bears an uncanny resemblance to Watergate in the several respects related above.

Not only are those assumptions not borne out by the legislative materials,[16] but they would ascribe to the lawmakers an intention to establish an illogical, entirely self-defeating scheme. That is not the way in which statutes are normally construed. See *Motor and Equipment Mfrs. Ass'n v. EPA*, 627 F.2d 1095, 1108 (D.C.Cir.1979); and see generally, *Sutherland* 2A *Statutory Construction*, § 45.09: Legislative Purpose and Public Policy (4th ed. 1973).

---

**13.** Slip opinion at 20.

**14.** The alleged intelligence operation may not have been centrally organized or directed from a high level and, of course, no one may have committed any offense.

**15.** The government continues to insist that no one—not the owner or possessor of stolen documents, not a court, and not the Congress—has any authority to sue or to review the Attorney General's refusal to apply for the appointment of Independent Counsel. Last month, the Chairman of the House Committee on the Judiciary and twelve of the committee members made a request pursuant to section 595(e) of the Act for the appointment of an Independent Counsel to investigate possible violations of the

Neutrality Act based on allegations similar to those that formed the basis of the *Dellums* suit. The Attorney General rejected their request and informed them that "[u]nder the Ethics in Government Act *it is my responsibility* to determine whether allegations constitute specific information of a federal crime" (emphasis added). Letter dated April 26, 1984, from Attorney General Smith to Chairman Rodino.

Impeachment is, of course, always available. But the enactment of the Ethics Act is testimony that Congress did not believe that resort to the extraordinary impeachment remedy was the appropriate means for resolving problems of the type presented by this lawsuit.

**16.** See Opinion of February 29, 1984 at pp. 15–17.

It is very clear that Congress did not intend to create an elaborate Independent Counsel machinery—which makes sense only in the context of a distrust of the Attorney General with respect to the prosecution of alleged wrongdoing of his official and political colleagues—only to establish the Attorney General as the "gatekeeper" of that machinery,[17] able, without the slightest review by anyone, to open the gate or to slam it shut as it may suit his purpose.[18]

The Court once again rejects the Department's contentions that, as a matter of statutory construction, no one has standing to seek judicial review of the Attorney General's refusal to comply with the Ethics in Government Act and that no court may review the Attorney General's decision.

### III

■ The government argues next that a judicial order requiring the appointment of Independent Counsel would be unconstitutional as violating the doctrine of the separation of powers.[19] More specifically, it contends that the prosecution of criminal cases "lies at the core of the Executive Branch powers" which Article II, Section 1 of the Constitution vests exclusively in the Executive Branch and is therefore beyond the power of the Congress and the Judiciary.[20] Considered in its component parts, the government's argument raises three different, though interrelated, questions, as follows.

17. Transcript of oral argument, April 27, 1984.

18. See note 40 *infra*.

19. However, at the hearing on the motion to dismiss, the government stated that it was not claiming that the Ethics Act or the requested judicial actions pursuant thereto are unconstitutional. In its answer to the complaint, the government, once again, did not raise the defense of unconstitutionality.

20. Memorandum at 13. The cases cited by the government are inapposite. See *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (dispute between special prosecutor appointed by the Attorney General and the President held justiciable); *Linda R.S. v. Richard D.*,

First. May the Congress constitutionally vest the authority to appoint a prosecutor in a court, that is, the special panel of the U.S. Court of Appeals?

Article II, Section 2, Clause 2 of the Constitution grants to the Congress authority to "vest the Appointment of such inferior Officers as they think proper, in the President alone, *in the Courts of Law*, or in the Heads of Departments" (emphasis added). See E. Corwin, *The Constitution and What It Means Today* 145 (1973); *United States v. Germaine*, 99 U.S. 508, 509–10, 25 L.Ed. 482 (1878). This constitutional provision obviously does not authorize the Congress to charge the courts indiscriminately and without reason with the responsibility for appointing officers in the Executive departments generally. On the other hand, the provision is plainly not meaningless.

The Supreme Court considered the question of the appropriate standard in *Ex parte Siebold*, 100 U.S. 371, 397–98, 25 L.Ed. 717 (1879). The Court there said, regarding the example of the appointment of a U.S. Marshal, that

He is an executive officer, whose appointment, in ordinary cases, is left to the President and the Senate. But if Congress should, as it might, vest the appointment elsewhere, it would be questionable whether it should be in the President alone, in the Department of Justice, or in the courts . . . .

410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) (private citizen has no judicially-cognizable interest in the prosecution or nonprosecution of another); *Gray v. Bell*, 712 F.2d 490 (D.C.Cir.1983) (former FBI director's suit under the Federal Tort Claims Act against the Attorney General for malicious prosecution was properly dismissed because it challenged discretionary decision to initiate prosecution); *Inmates of Attica Correctional Facility v. Rockefeller*, 477 F.2d 375 (2d Cir.1973) (despite mandatory language in 42 U.S.C. § 1987, Congress did not intend to preclude executive's exercise of prosecutorial discretion and court could not compel criminal prosecution); and *Pugach v. Klein*, 193 F.Supp. 630, 634 (S.D.N.Y.1961) (court cannot compel U.S. Attorney to prosecute state law enforcement officials for unlawful wiretapping).

But as the Constitution stands, the selection of the appointing power, as between the functionaries named, is a matter resting in the discretion of Congress. And, looking at the subject in a practical light, it is perhaps better that it should rest there, than that the Congress should be harassed by the endless controversies to which a more specific direction on this subject might have given rise .... But the duty to appoint inferior officers, when required thereto by law, is a constitutional duty of the courts; and in the present case there is no such incongruity in the duty required as to excuse the courts from its performance, or to render their acts void.

In the Ethics Act, Congress vested the power of appointment of Independent Counsel in the special panel of the U.S. Court of Appeals because it believed that the interests of justice would be best served if an impartial outsider, not beholden to the Attorney General, performed the responsibilities of that Office. Not only was that congressional decision not inherently unreasonable,[21] but, in the words of *Ex parte Siebold,* there might well have been an "incongruity" in imposing that duty upon the Attorney General, with the obvious conflicts of interests that this would have created.[22]

The courts' authority to appoint prosecutors has been exercised many times. 28 U.S.C. § 546 permits the U.S. District Court for any judicial district to appoint the United States Attorney whenever there is a vacancy in that office, and this has been done on innumerable occasions. Similarly, Rule 42(b) of the Federal Rules of Criminal Procedure allows criminal contempt proceedings to be initiated, not merely upon the application of a subordinate of the Attorney General, but also upon that of "an attorney appointed by the Court for that purpose." Both of these provisions have been upheld as valid. *Musidor, B.V. v. Great American Screen Design Ltd.,* 658 F.2d 60 (2d Cir.1981); *Matter of Green,* 586 F.2d 1247 (8th Cir.1978); *In re Yancey,* 28 F. 445 (C.C.Tenn.1886); 16 Op.Atty.Gen. 539 (1880); *United States v. Solomon,* 216 F.Supp. 835 (S.D.N.Y.1963); Wright, *Federal Practice and Procedure: Criminal* 2d § 711, pp. 852–53 (1982).

In short, both long-standing practice and case law teach that the Constitution does not stand as an obstacle to the appointment of a prosecutor by the special panel, at least not in the circumstances addressed by the Ethics Act.

Second. May Congress constitutionally authorize counsel who is largely[23] independent of the Attorney General[24] to investi-

---

**21.** Moreover, Independent Counsel, like the U.S. Marshal referred to in *Ex parte Siebold,* is an officer of the court as well as an Executive Branch official.

**22.** Former Attorney General Benjamin Civiletti has stated that "[i]t helps to think of the special prosecutor procedure as a mandatory recusal procedure. In the end, that is what it is." In his view, the purpose of the Act is not to change the rules of decision, but to change the decision-maker and to protect the criminal justice system from the danger that many perceived in Watergate—the danger that the Department of Justice cannot or will not enforce the criminal laws against high government officials. Benjamin R. Civiletti, *Post-Watergate Legislation in Retrospect,* 34 SW.L.J. 1043, 1052–53 (1981).

**23.** Independent Counsel, despite that designation, is not entirely independent of the Department of Justice. His tenure is limited (section 596(b)); the scope of his prosecutorial jurisdiction is narrowly defined by the special panel

(section 593); that jurisdiction is based upon the initial report of the Attorney General as to the matters which warrant further investigation (section 592(c)); he is required to "comply with the written or other established policies of the Department of Justice respecting enforcement of the criminal laws" (section 594(f)); and he may be removed by the Attorney General for good cause (section 596(a)(1)).

**24.** It is worth remembering that the Independent Counsel, upon his appointment, is free also of direction from the courts. The special panel performs only two functions: it appoints Independent Counsel and it defines his jurisdiction. The panel has no more authority to second-guess his decisions, including his decision whether or not to prosecute, than any other court would have in matters investigated and prosecuted by the Department of Justice.

This Court likewise would have no relationship whatever to the Independent Counsel, his investigation, or any prosecution he might initiate.

gate and prosecute federal criminal offenses?

Here again, the answer is in the affirmative, for it is clearly supported by the case precedents and the practice referred to above. It may be noted, additionally, that the following eminent academic authorities, among others, have expressed themselves in support of the constitutionality of the Act: Professors Paul Freund, Archibald Cox, Philip B. Kurland, Raoul Berger, and Lawrence Tribe. See, *Hearings on Special Prosecutor before the Senate Committee on the Judiciary,* 93d Cong., 1st Sess. (1973). Special committees of the American Bar Association and of the Association of the Bar of the City of New York have likewise concluded, after study, that the law does not suffer from constitutional infirmities. See Statement of Herbert S. Miller on behalf of the ABA before the Senate Subcommittee on Oversight of Government Management of the Committee on Governmental Affairs on the subject of the Special Prosecutor Provision of the Ethics in Government Act (May 20, 1981); Committee on Federal Legislation, The Association of the Bar of the City of New York, "The Special Prosecutor Provision of the Ethics in Government Act of 1978" (May 1981).

Beyond that, constitutional validity is supported by practice under the Ethics Act itself. Independent Counsel was recently appointed at the request of the present Attorney General to investigate whether presidential counselor Edwin Meese III committed violations of law.[25] If the congressional direction embodied in the Ethics Act were invalid under the separation of powers doctrine, it would have been improper for the special panel to entrust the Meese investigation to Independent Counsel, and it would likewise have been improper for the Attorney General to request the panel to do so. Attorney General William French Smith also requested the appointment of Independent Counsel to investigate charges against Secretary of Labor Raymond Donovan, and former Attorney General Benjamin Civiletti sought and secured the appointment of special prosecutors to investigate charges of wrongdoing by former White House assistant Hamilton Jordan and former Carter campaign manager Timothy Kraft.

The Attorney General can hardly be heard to claim that a procedure which he himself initiated as recently as last month is unconstitutional, nor could he, consistent with law, pick and choose among the cases in which he will, and will not, regard the Ethics Law as valid.

The Executive Branch has also acknowledged in other ways that the Independent Counsel provisions of the Ethics Act are constitutional.[26] The Department of Justice so advised the Congress in 1977 and in 1982.[27] Moreover, President Reagan in January 1983 signed into law amendments

---

**25.** Pursuant to the Attorney General's application under § 592(c)(1) of the Act, the special panel on April 2, 1984 appointed Jacob A. Stein, Esquire, to be Independent Counsel to investigate and prosecute with respect to the charges against Mr. Meese. The matters to be investigated include (1) alleged omissions on Mr. Meese's official financial disclosure forms, (2) other financial transactions involving Mr. Meese and individuals who were subsequently appointed to federal office, (3) stock trading by Mr. Meese and his family, (4) alleged special treatment for business entities in which Mr. Meese had a financial interest, (5) Mr. Meese's promotion in the military reserve, and (6) Mr. Meese's statements relating to, and knowledge of, various Carter campaign materials.

**26.** The Supreme Court has indicated that a claim of interference with a branch of govern-

ment is less viable if that branch has expressed its agreement with the particular law. See *Nixon v. Administrator of General Services,* 433 U.S. 425, 444, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1973).

**27.** Testimony of Assistant Attorney General John Harmon before Senate Committee on Governmental Affairs on S. 555, 95th Cong., 1st Sess. (1977) at 16 (judicial appointment of a special prosecutor is constitutional in view of extraordinary circumstances); Testimony of Associate Attorney General Rudolph Guliani before Senate Subcommittee on Oversight of Government Management on S. 2059, 97th Cong., 2d Sess. (1982) at 17 (while Department has serious concern about constitutionality of present law, these are substantially ameliorated by pending bill).

to the Ethics Act; yet if the President believed that the statute was an unconstitutional interference with Executive functions, he presumably would have been obliged to interpose a veto.

The Court concludes that precedent as well as common sense support the constitutionality of the Independent Counsel provisions of the Ethics which remove investigations and prosecutions from the direct control of the Attorney General in a limited number of cases for reasons which Congress could legitimately regard as valid.

Third. May a court, consistently with the Constitution, order the Attorney General to apply to the special panel for the appointment of Independent Counsel? [28]

There are literally hundreds of decisions supporting the authority of a court to require an Executive official to perform a responsibility which the law has imposed upon him. See decisions under 5 U.S.C. § 706(1) (Administrative Procedure Act; scope of review) and 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his duty); see also, 4 K.C. Davis *Administrative Law Treatise* § 23 (2d ed. 1983).[29]

As indicated above, there is no genuine issue as to the sufficiency of the evidence presented to the Attorney General. Plaintiffs are therefore simply requesting the Court to order the Attorney General to perform the ministerial duty which the Ethics Act plainly requires of him under these circumstances. See also, note 8 *supra.* The Act specifies that when the Attorney General is in possession of the appropriate evidence, he "shall" conduct an Ethics Act investigation and, if the investigation reveals reasonable grounds to believe that further investigation is warranted or if

ninety days have elapsed, he "shall" make application for the appointment of Independent Counsel.[30]

The government itself has explained that the traditional judicial reluctance to intervene in law enforcement decisions stems from the fact that in these areas there is no "law to apply." Memorandum at 11. However, the Ethics Act supplies the necessary "law"—it delimits the Attorney General's otherwise existing discretion by specifying the circumstances under which he must act; and by this means it establishes a basis for a judicial order requiring adherence to that law. . See also, note 10 *supra.* The exercise of such authority cannot fairly be regarded as raising even a substantial constitutional question.

---

In the end, the government's constitutional arguments proceed on the premise that, because of the rigidity of the doctrine of the separation of powers, Congress is without authority to decide that truly "independent counsel" shall be entrusted with the investigation and prosecution of colleagues of the Attorney General.

The Supreme Court has admonished the lower courts that, in matters involving separation of powers, a pragmatic, flexible approach, must control (*Nixon v. Administrator of General Services, supra,* 433 U.S. at 442, 97 S.Ct. at 2789) and that separation of powers questions must be resolved "according to common sense and the inherent necessities of the governmental coordination." *Buckley v. Valeo,* 424 U.S. 1, 122, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976) (*quoting Hampton & Co. v. United States,* 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928)). It is difficult to think of a situation which more

---

**28.** With regard to the appropriateness of such relief, see Part IV *infra.*

**29.** The specific duty in question is largely irrelevant. Indeed, properly viewed, an order by the Court to require the Attorney General to comply with the law enacted by the Congress does not even interpose the Court between the Attorney General and his prosecutorial functions. If there is such an interposition, it occurs at the stage when the special panel appoints an Inde-

pendent Counsel, but that appointment, as we have seen, raises no substantial constitutional problems.

**30.** Compare section 591(c) of the Act which provides that the Attorney General "may" conduct an Ethics Act investigation and apply for Independent Counsel with respect to individuals who are not high-ranking officials.

clearly calls for application of these principles than the one here before this Court. When Congress considered the Ethics Act, it had recently experienced a breakdown in impartial law enforcement due to the faithlessness of an attorney general, and it accordingly proceeded to enact the relatively modest, narrowly-drawn, prophylactic measures embodied in that Act. There is no reasonable basis for rejecting that statutory direction on the basis of the crabbed interpretation of the Constitution proffered by the Department of Justice, and the Court declines to do so.

## IV

■ The Court must consider next the question of the appropriate relief. Plaintiffs request that the Court issue an order directing the Attorney General to apply to the special panel for the appointment of Independent Counsel. The government objects, pointing out, correctly, that in the only two cases brought thus far under the Act, the courts did not go that far but ordered the Attorney General only to conduct a preliminary investigation. See *Nathan v. Attorney General*, 563 F.Supp. 815 (D.D.C.1983) and *Dellums v. Smith*, 573 F.Supp. 1489 (N.D.Cal.1983).[31] The government further argues that, since there has been no preliminary investigation within the meaning of the Ethics Act, the Court lacks power to order the Attorney General to apply for the appointment of Independent Counsel. These arguments likewise lack merit.

The statute directs the Attorney General in section 592(c) to apply to the special panel for the appointment of Independent Counsel in either of two contingencies: (1) if he finds, upon the completion of his preliminary investigation, that "further investigation or prosecution is warranted," or (2) "if ninety days elapse from the receipt of the information without a determination by the Attorney General that there are no reasonable grounds to believe that further investigation or prosecution is warranted."

It is plain that Congress included the second provision precisely to deal with the very situation before this Court: a case where despite specific and credible information, the Attorney General simply refuses to conduct an Ethics Act investigation for a period in excess of ninety days.[32] Thus, the statute itself prescribes the remedy: where there is that kind of a delay, the next step is not another investigation but an application to the special panel for the appointment of Independent Counsel.

■ The Department of Justice has already conducted an eight-month investigation.[33] That investigation, although not as exhaustive as might be an investigation conducted by an Independent Counsel (see note 35 *infra*), is amply sufficient to establish the facts required for a resolution of the only question that is relevant at this

**31.** It should be noted, however, that in *Dellums* the plaintiffs asked for no more than that, but that the court nevertheless acknowledged that, in an appropriate case, application for the appointment of Independent Counsel could be required. *Dellums v. Smith, supra*, 573 F.Supp. at 1496 n. 5. Moreover, in its order requiring the Attorney General to conduct a preliminary investigation, the court further directed that

> if the Attorney General does not make the determination described in 28 U.S.C. § 592(b)(1) within ninety days of the date of this order, he shall apply for the appointment of an independent counsel as provided in 28 U.S.C. § 592(c)(1).

573 F.Supp. at 1505.

In *Nathan*, the court recognized that appointment of Independent Counsel would ordinarily be the appropriate remedy, and it declined to

grant that remedy only in the exercise of its discretion. See *Nathan v. Attorney General*, 563 F.Supp. 815 (D.D.C.1983).

Moreover, as this Court noted on February 29, 1984, the case for the appointment of an Independent Counsel is, for a variety of reasons, far more clear-cut here than in either *Nathan* or *Dellums*, at 1507.

**32.** Plaintiffs submitted their formal request to the Attorney General in July of last year—more than nine months ago. See also section 706(1) of the Administrative Procedure Act, 5 U.S.C. § 706(1), which authorizes a court to compel agency action "unlawfully withheld or unreasonably delayed."

**33.** In neither *Nathan* nor *Dellums*, had any investigation been conducted.

time—whether the Attorney General has been presented with non-frivolous allegations having a potential chance of substantiation [34] that high-level officials have committed federal offenses. Based upon this record,[35] the answer must clearly be in the affirmative.[36] In those circumstances, it would be both illogical and wasteful to require the Department of Justice to conduct an investigation duplicating its earlier inquiry preparatory to a determination that application must be made to the special panel for the appointment of Independent Counsel.

For the reasons stated, the Court is contemporaneously herewith issuing an order requiring the Attorney General to apply within seven days hereof to the special panel of the U.S. Court of Appeals for the appointment of Independent Counsel to investigate whether certain officials covered under the Ethics Act violated federal criminal laws in connection with the transfer of documents from the Carter White House to the Reagan headquarters during the 1980 presidential campaign.

## V

■ The government has asked that, if the Court grants the relief requested by the plaintiffs, it stay the effectiveness of its order pending appeal. Under *Virginia*

*Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921 (D.C.Cir.1958) and *Washington Metropolitan Transit Comm'n v. Holiday Tours*, 559 F.2d 841 (D.C.Cir.1977), the Court must consider several factors—likelihood of success on the merits, the balance of injuries, and the public interest—in determining whether a stay of its order should be granted pending disposition of the appeal.[37]

First. The government has not made a substantial showing that it is likely to succeed on the merits of its appeal.[38]

There are basically three substantive legal issues before this Court and therefore potentially before the appellate courts. The government has not seriously contested plaintiffs' claims with respect to the first of these questions—whether evidence submitted to the Attorney General is sufficient to trigger the Ethics Act. As concerns the second issue—standing—every court which has passed on that question has resolved it against the position taken by the government. The third issue—constitutionality of the statute—was not even pursued on the government's motion to dismiss (see note 19 *supra*) but was added only as an afterthought in the subsequent summary judgment motion. Beyond that, for the substantive reasons detailed in the

**34.** See S.Rep. 170, 95th Cong., 1st Sess. 54 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad. News 4270.

**35.** The report issued by the Department of Justice at the conclusion of its own investigation does not negate any of the evidence submitted by plaintiffs. Instead, it notes that Reagan campaign officials who either possessed or were aware of the materials "denied any knowledge of how they were originally obtained," and it states that "in some cases, it was impossible to determine how documents were obtained due to the professed lack of memory or knowledge on the part of those in possession of the documents." *Department of Justice press release* dated February 23, 1984. Independent Counsel might be more successful than the Department in refreshing some of the recollections by use of such means as the grand jury and the power to subpoena, to grant immunity, and to plea bargain. It appears from the Department of Justice report that in its investigation it made use of none of these devices.

**36.** As explained in the Court's February 29, 1984, Opinion, the Attorney General lacks the authority under the Ethics Act to conduct his own investigation and then declare himself satisfied that no criminal law violations occurred. Slip opinion at 10 n. 23. That final determination is not the Attorney General's to make.

**37.** Although in its motion the government purports to request only a stay pending appeal, the arguments advanced in its brief indicate that what is actually being sought is a stay pending the *disposition* of the appeal.

**38.** The *Holiday Tours* formulation of the test, which permits a court to grant a stay pending appeal if the movant has made a substantial case on the merits, applies only when the other factors strongly favor interim relief—a condition which, as explained below, is not present here.

body of this Opinion and in the Opinion of February 29, 1984, the Court finds against the government on the likelihood-of-success prong of the test for a stay.

Second. The government has not shown that, without a stay, it will be irreparably injured. The government claims that, should it ultimately prevail on appeal, "investigatory and prosecutorial resources may have been wasted on a matter not legally demanding of any action." Memorandum at 22.[39] There are several problems with that claim.

As indicated, the government cannot and does not argue that the evidence presented by plaintiffs is not sufficient to trigger the Independent Counsel mechanism of the Ethics Act. Rather, its arguments amount to an assertion that the Attorney General may escape the requirements of the law because he is immune from suit for one reason or another; i.e., plaintiffs' lack of standing, unreviewability of his decisions, or the principle of the separation of powers. Yet it is clear that the Attorney General may, on his own, appoint a special prosecutor whether or not he is required to do so by a court, and at least one of the predecessors of the present Attorney General has done so. See Nader v. Bork, 366 F.Supp. 104 (D.D.C.1973); see also, United States v. Nixon, supra. It is questionable whether a court of equity should protect

the Attorney General pending appeal from what appears to be his plain duty under the law merely because he believes that he cannot be forced to perform that duty.

The government's concern with waste of investigatory and prosecutorial resources is equally insubstantial. The Department of Justice has conducted an eight-month inquiry the results of which would presumably be available to Independent Counsel. Furthermore, Independent Counsel is already conducting an investigation of certain matters involving Mr. Meese, including his knowledge of the removal of the debate papers from the Carter White House. It is difficult to see what additional significant investigatory resources would be needed to determine whether and to what extent other high officials were involved in this affair.[40] Indeed, to conserve government resources, the special panel may decide to entrust that responsibility to the Independent Counsel it appointed to investigate Mr. Meese. In short, the injury to the government from the denial of a stay is minimal.[41]

Third. That leaves the question of the risk of harm to the public interest.[42] The Court concludes that the public interest strongly favors a rapid resolution of this controversy.

The strict time limits provided for in the Act suggest that Congress considered de-

---

**39.** The government also argues that the appointment of an Independent Counsel may moot the controversy. This is far from certain, however, for not only is it possible that no one may be prosecuted, or at least not before any appeal is decided, but if there is such a prosecution, the present issues could conceivably be raised by a defendant at that time. As for the bare legal issue of the Attorney General's claimed unreviewable power, it is presently being litigated in Nathan and Dellums, supra, and it will therefore not be dissipated regardless of what occurs here.

In any event, particularly because the Attorney General has his own duty to apply for the appointment of Independent Counsel irrespective of what the courts may do, the possibility of mootness should not be taken, by itself, as a sufficient reason for a stay. Mootness is a possibility in many, if not most, injunction cases, yet such cases to not automatically qualify for stays pending appeal on that basis. See also,

Cole v. Harris, 571 F.2d 590, 593 (D.C.Cir.1977); Plaquemines Parish Commission Council v. United States, 416 F.2d 952, 953 (5th Cir.1969); Resident Advisory Board v. Rizzo, 429 F.Supp. 222, 226 (E.D.Pa.1977), modified, 564 F.2d 126 (3rd Cir.1977).

**40.** The evidence implicating James Baker III, David Stockman, and William Casey, among others, appears to be at least as strong as that relating to Mr. Meese. See Appendix. Yet, as noted, Mr. Meese is being investigated by Independent Counsel but others are not.

**41.** To be sure, if prosecutable offenses are found to exist, resources will be needed for the prosecution. That, however, can hardly be regarded as a "waste" of resources.

**42.** Since plaintiffs brought this action essentially to vindicate the public interest, injury to them may be considered under this rubric.

lay harmful—the longer charges of wrongdoing in high places remain unresolved, the more unsettling to the public and its confidence in its government. In that regard, Congress undoubtedly had in mind the lessons of Watergate. If prompt action had been taken in 1972, when the Watergate allegations first surfaced, the nation would undoubtedly have been spared the convulsions associated with that "cancer," [43] and the controversies associated with that episode would probably not have grown until they eventually consumed the Nixon presidency.

These considerations strongly suggest where the public interest lies. It lies in not delaying resolution of the substantive issue—whether high officials committed violations of law—while appeals proceed through the Court of Appeals and possibly the Supreme Court. It may be that no one named in the documents submitted to the Attorney General committed an offense, and if that be so, the matter had best be determined now, before public confidence is eroded. That can effectively be done only in accordance with the direction of the Ethics Act, that is, by an investigation conducted by Independent Counsel, rather than by an inquiry conducted under the aegis of the Attorney General, a close associate of many of those named in the documents.[44] On the other hand, if criminal offenses were committed, the public interest demands that this, too, be determined now rather than after a lengthy period of festering, accompanied by speculation and suspicion which, just as in Watergate, would tend to magnify rather than to abate the problem.[45]

For these reasons, the Court will enter judgment requiring the Attorney General to apply to the special panel of the U.S. Court of Appeals for the appointment of Independent Counsel, and it will deny the requested stay.

## APPENDIX

Plaintiffs' Formal Request to the Attorney General contained detailed and specific information about possible criminal wrongdoing by high government officials, including the following allegations, which are quoted verbatim from the Formal Request:

A. "[A]t least hundreds of pages of documents from the Carter White House and Executive Offices had been removed or copied and then turned over to the 1980 Reagan campaign organization. These documents allegedly range from Carter's debate briefing book to internal strategy papers to information contained in the super-secret National Security Council memoranda." *Id.*, p. 6.

B. "[T]hree of President Reagan's most senior and important aides, and one former high-ranking aide, have admitted that they had seen or possessed materials taken from the Carter White House or Executive Offices during the course of the Presidential campaign. These officials are:

— *James A. Baker, III*, White House Chief of Staff and former top Reagan

---

**43.** John Dean, *Blind Ambition* at 200 (1976).

**44.** Former Watergate Special Prosecutor Archibald Cox testified before the Senate that

The pressures, the tensions of divided loyalty are too much for any man, and as honorable and conscientious as any individual might be, the public could never feel entirely easy about the vigor and thoroughness with which the investigation was pursued. Some outside person is absolutely essential.

Hearings on S. 2803 and S. 2978 Before the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary, 93rd Cong., 2d Sess. (1974) at 200.

**45.** As Senator Eagleton said in his supplemental views to the 1982 Senate Report:

If we allow the special prosecutor act to expire, the country will soon afterward face the now-familiar pattern: slowly unfolding revelations about a high-level Administration official, or someone else close to the President; a Justice Department committed to proving that it can handle sensitive cases to public satisfaction, even if its predecessors could not; a scandal widening, somehow compromising or implicating those doing the investigation; the issue becoming partisan and a field day for the media; substantial damage to the White House, and a resulting loss of public confidence.

S.Rep. No. 496 at 36 97th Cong., 2d Sess. *reprinted in* 1982 U.S.Cong. & Ad.News at 3563.

campaign aide. He allegedly acknowledges receipt and possession of a loose-leaf briefing book of Carter materials. He has stated that he obtained the book from (now) *CIA Director William Casey*.

— *David Stockman,* Director of the Budget Office, and former Reagan campaign assistant. Mr. Stockman used Carter briefing materials he described as 'filched' to prepare for a mock debate with candidate Reagan. Mr. Stockman has publicly described these documents as useful to him.

— *David Gergen,* White House Communications Director, and former Reagan Campaign aide and co-coordinator of Reagan's debate planning team. He also allegedly acknowledges receiving and possessing Carter briefing materials.

— *Richard Allen,* former National Security Advisor and Reagan's chief foreign policy advisor during the campaign, has allegedly acknowledged receiving excerpts of the daily National Security Council reports from someone in the White House who he has not named publicly." *Id.,* pgs. 6–7.

C. "Carter White House or Executive Office documents have allegedly recently been uncovered in a variety of places. Newsweek has listed the four main depositories of Carter documents discovered to date (Newsweek, July 18, 1983, at pgs. 15–16):

— Reagan campaign archives at the Hoover Institution in Palo Alto, California.

— Executive Office files of David Gergen, White House Communications Director. Approximately 1,000 pages of foreign policy and national security documents were filed under 'Afghanistan.'

— Files of Frank Hodsoll, former Reagan debate team coordinator and current Chairman of the National Endowment for the Arts.

— Materials found in a trash dumpster behind Reagan's campaign headquar-

ters immediately after the election." *Id.,* pg. 8.

D. "There may in fact have been a large-scale operation to obtain secret Carter documents for the Reagan campaign. Time magazine recently reported that (now) CIA Director William Casey 'set up a political intelligence-gathering apparatus for the Reagan campaign (possibly using Max Hugel, later appointed CIA Deputy Director) ... Cooperative former agents of both the FBI and CIA were used to gather political information from their colleagues then still active in the two agencies.' Time, July 25, 1983, at pg. 22. Newsweek has reported that another individual, Stefan A. Halper, has been named as 'the person in charge' of an operation 'to collect inside information' on Carter's foreign policy for the Reagan campaign. Newsweek, July 18, 1983, at pg. 19." *Id.,* pg. 8.

E. "Several memos distributed within the Reagan campaign organization specifically refer to a 'White House mole.' The most important examples are as follows:

— Memo from H. Daniel Jones, III to 'Bob Gray, Bill Casey, Ed Meese,' dated October 27, 1980, and listing the President's schedule for the remainder of the campaign. This memo, reprinted in Newsweek, July 18, 1983, at pg. 15, begins: *'According to latest information from reliable White House mole ....'*

— Memo on Carter White House stationery from Anne Wexler and Al McDonald to 'The Cabinet' dated October 10, 1980, titled, 'Economic Information,' with a handwritten note in the upper left hand corner: 'Bob—Report from White House mole.' Reprinted in Newsweek, July 18, 1983, at pg. 15.

— Memo from Reagan campaign aide Wayne Valis to David Gergen, dated October 21, 1980, stating: 'These notes are based on a Carter debate staff brain storming session ... from a source intimately connected to a Carter debate staff member. Reliable. I gave a copy to Jim Baker.' Wash-

ington Post, July 17, 1983, at pg. A6. Attached to this memo was a typewritten memo containing 10 points that Carter allegedly planned to raise during the debate or that his advisors intended to do in the last days of the campaign. *Id.*

— This same Reagan campaign aide, Wayne Valis, is reported in the press to have told another Reagan campaign worker that he had 'someone sleeping with someone in the White House to get information for us.' Newsweek, July 18, 1983, pgs. 14–21; Washington Post, July 8, 1983, at pg. A3." *Id.*, at pgs. 8–9.

F. "[S]everal high Administration officials appear to have made directly contrary statements. Most significantly, White House Chief of Staff James Baker has allegedly stated publicly that he received Carter's domestic policy briefing book from now CIA Director William Casey, but Mr. Casey has allegedly contradicted this in an interview with the New York Times. In that interview, Mr. Casey allegedly stated that he had no recollection of the briefing book and that it would have been 'totally uncharacteristic and quite incredible' for him to have obtained the Carter debate book ...."

"Another significant contradiction is between public statements made by former National Security Advisor Richard Allen and Jerry D. Jennings, who was a National Security Counsel security officer in the Carter Administration and is currently the Director of the White House Office of Science and Technology. Mr. Allen has reportedly written to Rep. Albosta's Subcommittee stating that he received excerpts of Carter National Security Council staff reports from Mr. Jennings, but Mr. Jennings allegedly told the Washington Post in an interview: 'Any such suggestion is untrue and absolutely ludicrous' ...."

"Finally, there appears to be a significant disparity between White House Chief of Staff James Baker, who allegedly stated in a letter to Rep. Albosta's Subcommittee that he had passed on a 'large loose-leaf' binder of Carter materials to David Gergen, now White House Communications Director, and the letter sent by Mr. Gergen to the Albosta Subcommittee in which Mr. Gergen allegedly states that he had never seen these Carter materials." *Id.*, pgs. 9–10.

Plaintiffs' Formal Request to the Attorney General also cited more than twelve federal criminal laws which may have been violated by the individuals who transmitted, received, and/or used the materials cited in the Formal Request.... These federal criminal laws included:

— 18 U.S.C. § 371 (conspiracy)
— 18 U.S.C. § 595 (interference with government activities)
— 18 U.S.C. § 641 (theft of public property)
— 18 U.S.C. § 654 (conversion of property of another)
— 18 U.S.C. § 661 (embezzlement and theft)
— 18 U.S.C. § 798 (disclosure of classified information)
— 18 U.S.C. § 1905 (disclosure of confidential information)
— 18 U.S.C. § 2071 (removal of government property)
— 18 U.S.C. § 2112 (robbing personal property)